FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAY 28 2010 ★
BROOKLYN OFFICE

ORIGINAL
O&F
C/M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In the matter of E.D.T., an infant under the age of 16, by her natural parent, Ms. IDES ADAMAH,

                Petitioner,

-against-

EVANS H. TAYSON,

                Respondent.
------------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 09-CV-5477 (FB)

*Appearances:*
*For the Petitioner:*
RODNEY M. ZERBE, ESQ.
Crowell & Moring LLP
590 Madison Avenue
New York, New York 10022

*For the Respondent:*
GIL SANTAMARINA, ESQ.
Santamarina & Associates
260 Madison Avenue
New York, New York 10016

**BLOCK, Senior District Judge:**

       This petition is brought by Ides Adamah ("Adamah") under the Hague Convention on the Civil Aspects of International Child Abduction of 1980 ("the Hague Convention"), implemented by the International Child Abduction Remedies Act of 1988 ("ICARA"). Pub. L. No. 100-300, 102 Stat. 437 (1988), *codified at* 42 U.S.C. §§ 11601-11610. Adamah seeks the return of her child ("E.D.T.") to the United Kingdom. E.D.T. currently resides in the United States with Evans Tayson ("Tayson"), Adamah's former husband and E.D.T.'s biological father.

       In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the following constitutes the Court's findings of fact and conclusions of law. Based on those findings and conclusions, the petition is granted.

# THE EVIDENTIARY RECORD

The Court held a hearing on April 13-15, 2010 ("the Hearing"). Adamah testified on her own behalf; Adamah's current husband Abdul Glover ("Glover") also testified, via telephone. Tayson testified on his own behalf, as did his current wife, Ama deGraft-Johnson ("deGraft-Johnson"), and his brother, Tony Tayson.

Adamah submitted a number of documents in support of her petition, including, but not limited to:

1. Adamah and Tayson's "Certified Copy of an Entry of Marriage" from the United Kingdom (June 28, 2001) (Ex. 1);

2. E.D.T.'s "Certification of Birth" in New York City (Sept. 19, 2002) (Ex. 3);

3. An "Acknowledgment of Paternity" of E.D.T. by Tayson (dated July 3, 2003; filed Sept. 4, 2003) (Ex. 4);

4. E.D.T.'s "Certificate of Birth," listing Adamah as the mother and Tayson as the father ("approved for filing" Sept. 4, 2003; issued Oct. 7, 2003) (Ex. 16);

5. E.D.T.'s United States Passport (issued Apr. 8, 2003) (Ex. 5);

6. E.D.T.'s United Kingdom Passport (issued Oct. 31, 2003) (Ex. 7);

7. A decree of divorce rendered by the Bromley County Court, United Kingdom, dissolving the marriage of Adamah and Tayson (Sept. 27, 2005) (Ex. 9B);

8. A "Statement of Arrangements for Children" issued by the same authority, bearing Adamah's signature (Feb. 14, 2005) and Tayson's signature (May 22, 2005) (Ex. B to the Order to Show Cause);

9. Records from E.D.T.'s primary school in London, dating between February and December 2008 (Ex. 11);

10. A number of text messages exchanged between Adamah and Tayson from the summer of 2008 until the spring of 2009 (Exs. 12A, 12B, 12C);

11. Tayson and deGraft-Johnson's "Affidavit and Application for a Marriage License" to the City of New York (Sept. 28, 2007) (Ex. 17).

Tayson submitted a handful of documents including, but not limited to, a letter from a United Kingdom housing official, Gemma Robinson (Resp. Ex. 4), and a stipulation between the parties as to certain child benefit payments in the United Kingdom for the years 2003-2008 (Resp. Ex. 5).

## FINDINGS OF FACT

Before stating its findings of fact, the Court notes that the credibility of both parties was suspect. Adamah conceded at the hearing that E.D.T. was a resident of Ghana between 2003 and 2008; however, her petition and numerous documents submitted to British authorities claimed that E.D.T. had been a resident of the United Kingdom during that same period. This misstatement of fact was material since it tended to strengthen the child's connection to the United Kingdom.

Tayson testified considerably less credibly than Adamah. Whereas Adamah conceded her misstatement, Tayson attempted to distance himself from any evidence tending to weaken his claim, including documents bearing his signature. For example, Tayson denied having signed the "Statement of Arrangements for Children" issued by the Bromley County Court, despite the remarkable similarity between his signature on that document and other signatures he admitted were his. *See* Hr'g Tr. at 402-03; *see also* Conf. Tr. at 20 (Dec. 22, 2009).

Tayson contended that he "never married Adamah." Hr'g Tr. at 412. That cannot be reconciled with his testimony — only a few minutes later — that he "knew that he

3

was married in London." Hr'g Tr. at 416. Nor can it be reconciled with his earlier statements that he "found out" in 2007 that he and Adamah had been divorced. Hr'g Tr. at 379. Most importantly, it cannot be reconciled with the certificate of marriage between the parties which bears Tayson's signature.[1] Petr's Ex. 1.

Finally, and perhaps most damaging to Tayson's credibility, are the records of the City of New York that show that Tayson and deGraft-Johnson applied for a marriage license in September 2007. Petr's Ex. 17. The application lists Adamah as a former spouse, specifies that the divorce was "mutual," and states a date of divorce of August 24, 2006. *See* Petr's Ex. 17. Tayson testified that he "made up" the date of August 24, 2006. Hr'g Tr. at 415-416. Either Tayson *already knew* he was divorced, *or* he was attempting to commit bigamy.[2] The Court assumes the former, but neither of the possible interpretations bolsters his credibility.

In sum, the credibility of both parties is blemished. Having witnessed their testimony firsthand, and having carefully reviewed the documents submitted, the Court finds Adamah to be the more credible witness. Her version of events—although implausible at times—was corroborated at several critical junctures by contemporaneous

---

[1] At various points in his testimony Tayson contended that he had both a "signature," and a way he "wrote [his] name," and that these were somehow different. *See, e.g.*, Custody Hr'g Tr. at 401:17-24. Whether or not that is true, the Court credits the certificate of marriage, and finds that Tayson himself wrote or signed his name in the lower left-hand corner. *See* Petr's Ex. 1.

[2] Tayson attempted to rehabilitate himself by claiming that a marriage license had not been issued. *See, e.g.*, Hr'g Tr. at 415 ("Q: Did you sign the document?" "A: It wasn't a marriage certificate."). When pressed, he conceded that he had signed the document, which unequivocally stated that he was divorced (albeit on a date fabricated by him). Thus, whether a license actually issued was an irrelevancy.

4

documents. Tayson's testimony cannot be rehabilitated unless one either ignores these documents or disputes their authenticity—as Tayson did repeatedly. Thus, where the testimony of the parties conflicts, the Court credits Adamah's testimony over Tayson's. With these preliminary conclusions in mind, the Court makes the following findings of fact:

Adamah and Tayson were legally married on June 28, 2001, in London. The couple thereafter relocated to the United States; Adamah arrived on February 3, 2002. Petr's Ex. 2. E.D.T. was born on September 19, 2002, in the Bronx. Petr's Ex. 3. E.D.T. remained in the United States for approximately one year, living with her parents in New Jersey.

At some point during 2003, Adamah made plans to relocate—with E.D.T.—to Ghana. Tayson was aware of these plans because he assisted in putting them into action: he went to the Ghanaian consulate in New York and obtained a visa for E.D.T., dated September 10, 2003. Petr's Ex. 5.

The Ghanaian visa is critical. It is a contemporaneous document establishing that Adamah had already formed the intent to take her daughter to Ghana before she left the United States. Adamah testified that Tayson personally obtained the Ghanaian visa and was aware that she would be taking E.D.T. to Ghana. *See* Hr'g Tr. at 56-57. Tayson denied that he had obtained the visa, and denied that he was aware that Adamah would be going to Ghana, with E.D.T., from London. *See* Hr'g Tr. at 409-10. On account of its conclusion that Adamah was the more credible witness, the Court credits her account, and concludes that both parents knew the child would eventually travel to and reside in Ghana.

5

Adamah and E.D.T. left New York for London on or about September 13, 2003. Petr's Ex. 5. They stayed with Tony Tayson for approximately two months. Hr'g Tr. at 69-70. On or about November 16 or 17, 2003, Adamah and E.D.T. flew to Accra, Ghana. Petr's Ex. 5. After eight to ten weeks, Adamah returned to London. Hr'g Tr. at 72. E.D.T. remained in Ghana until early 2008 in the care of her maternal grandmother.[3] Hr'g Tr. at 80.

Tayson visited E.D.T. at the home of her maternal grandparents in Ghana in June 2004. Hr'g Tr. at 81 (Adamah's testimony); 363-64 (Tayson's testimony). He returned to the United States, but attempted to maintain contact with E.D.T. via occasional telephone calls; he made no further visits. Hr'g Tr. at 378:22-379:03. Adamah visited E.D.T. in Ghana once per year, staying two to three months each time. Hr'g Tr. at 80.

In May 2004, while E.D.T. remained in Ghana, Adamah attended Tayson's university graduation in New York. Hr'g Tr. at 86. Tayson did not object to E.D.T.'s living arrangements at that time. *Id.* Adamah returned to London after about two weeks. *Id.* Until her travel in connection with her petition, she had not returned to the United States. Hr'g Tr. at 86-87.

Adamah commenced divorce proceedings in the United Kingdom against Tayson at some point in late 2004 or early 2005. Hr'g Tr. at 87. Tayson was well aware of these proceedings; on May 22, 2005, he signed a "Statement of Arrangements," in which

---

[3] Adamah testified that, in the Ghanaian culture, it is normal for children to live with a grandmother for portions of their formative years. Hr'g Tr. at 63-64.

he agreed that E.D.T. would remain in Adamah's custody. *See* Ex. B to Order to Show Cause. The marriage was legally dissolved on September 27, 2005. *See* Petr's Ex. 9B.

Adamah arranged for E.D.T. to join her in London on or about January 21, 2008. Petr's Ex. 10. E.D.T. subsequently enrolled in school in London on or about February 25, 2008. Petr's Ex. 11. She attended that school for the remainder of 2008. *Id.*

Tayson visited London in June of 2008, reconnecting with Adamah and E.D.T. Initially, he accused Adamah of having kidnaped E.D.T.; British authorities declined to take action. Hr'g Tr. at 95-96. Adamah agreed to let Tayson visit with E.D.T., however. They met for two hours in Greenwich Park; E.D.T., Tayson, and Adamah were present, as were Tony Tayson and Abdul Glover. Hr'g Tr. at 96-97. Subsequent to that meeting, Tayson and Adamah began to communicate more frequently, via telephone conversations and text messages.[4]

In sum and substance, the text messages demonstrate that Adamah agreed to send E.D.T. to visit Tayson for the Christmas holiday of 2008, on a ticket purchased by Tayson, and that Tayson agreed to return E.D.T. in time for her to begin the new school term in January 2009.[5]

---

[4] Tayson objected to the admission of the text messages at the hearing, and renewed his objection in a post-hearing brief. *See* Santamarina Aff. (Apr. 16, 2010). The Court adheres to its earlier ruling to admit the text messages into evidence. *See* Hr'g Tr. at 429-30. Even if they were not independently authenticated by the service provider or by a forensic specialist, Adamah's testimony concerning the text messages was sufficient to establish their authenticity. *See generally* Hr'g Tr. at 109-29.

[5] The more probative text messages include, but are not limited to, the following:

> Sept. 21, 2008 (17:44) Adamah to Tayson: "Last day of term is 19 dec go bk on 6 jan.so she can cm 20 dec nd liv 3/4 jan let me no if's ok 4 u.

After E.D.T. arrived in the United States, Tayson refused to return her to the United Kingdom, despite Adamah's repeated demands to do so. Adamah promptly instituted formal proceedings to demand E.D.T.'s return. When first contacted by the authorities, Tayson told them that E.D.T. had decided to stay with him in the United States of her own volition. Petr's Ex. 24. In his first appearance before the Court, however, he said that he had decided to keep E.D.T. because of Adamah's medical condition. Conf. Tr. at 5 (Dec. 22, 2009). Only during his testimony at the hearing months later did he contend that he and Adamah had agreed that E.D.T. would be remaining with him permanently in the United States. *See, e.g.*, Hr'g Tr. at 454. To the extent that deGraft-Johnson's testimony accords with Tayson's statements that the arrangement was for E.D.T. to remain in the United States permanently, *see, e.g.*, Hr'g Tr. at 465, the Court declines to credit it. DeGraft-

---

> Sept. 21, 2008 (17:48) Tayson to Adamah: "Thats ok w me. would u also scout 4 cheap air tic? am going to do the same. wl tlk 2 u guys later"
>
> Dec. 10, 2008 (19:30) Tayson to Adamah: "i bk her flt nd they took ur info. take an id with u 2 d airprt."

*See* Petr's Exs. 12A, 12C. Text messages exchanged after E.D.T.'s arrival support Adamah's testimony that she had sent E.D.T. to Tayson on the assumption that she would be returned to London:

> Dec. 23, 2008 (06:01) Tayson to Adamah: "She does not listen as u said. i want 2 help. *it was never my intention 2 keep her. . . .*" (emphasis added)
>
> Jan. 24, 2009 (20:37) Adamah to Tayson: "If i shd die 2day cos of wt u doin 2 [E.D.T.], i wl hld u rspnbl. she kps tlin u she s not happy liven thr nd u still kpin her. do u no how i feel whn i tlk 2 her nd tells me she wnt 2 cm 2 me? no cos u only thinkin abt ur self nd nt how she feels. if smthn hpns i wl nvr let u rest i promiss u.

*See* Petr's Ex. 12A, 12C.

Johnson conceded that she was not party to any conversations between Tayson and Adamah; she could only relate what Tayson told her about E.D.T.'s arrival. Hr'g Tr. at 469-70. As a result, her testimony on the "agreement" to have E.D.T. remain in the United States is only credible if Tayson credibly testified about the "agreement." He did not.

## CONCLUSIONS OF LAW

Both the United States and the United Kingdom are signatories to the Hague Convention.[6] It endeavors "to protect children internationally from the harmful effects of their wrongful removal," and to "establish procedures to ensure their prompt return[.]" Hague Convention Pmbl.

Adamah's petition was filed on December 15, 2009, less than one year after E.D.T.'s arrival in the United States. *See* Hague Convention art. 12, ¶ 1 (distinguishing between petitions filed less than one year following a removal or retention and those filed more than one year following a removal or retention). To prevail, Adamah must show that (1) E.D.T. was habitually resident in the United Kingdom, and was removed to or retained in the United States; (2) the removal or retention was in breach of Adamah's custody rights under the law of the United Kingdom; and (3) Adamah was exercising those rights at the time of the removal or retention. *Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005). If these elements are established, the Court must "order the return of the child forthwith[.]" Hague Convention art. 12, ¶ 1; *see also* ICARA, 42 U.S.C. §§ 11603(b), (d) (requiring courts to decide petitions "for the return of a child . . . in accordance with the Convention"). Even

---

[6] Hague Conference on Int'l Law: Report of the 2d Special Comm'n Meeting to Review the Operation of the Hague Convention on the Civil Aspects of Int'l Child Abduction, 33 I.L.M. 225, 225 (1994).

9

where the elements are proven, return is not permitted if one of the affirmative defenses set forth in the Hague Convention applies; Tayson has not raised any of the affirmative defenses.[7]

Adamah had lawful custody of E.D.T. and was exercising those rights when Tayson retained E.D.T. in late 2008. Therefore, the only element of Adamah's burden at issue is whether the child was "habitually resident" in the United Kingdom at the time she was retained in the United States in 2008. "Neither the Hague Convention nor its implementing legislation defines 'habitual residence.'" *Villegas Duran v. Arribada Beaumont*, 534 F.3d 142, 147 (2d Cir. 2008). The Second Circuit has articulated a standard:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to [a] new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

---

[7] The affirmative defenses are: (1) the petition was filed more than a year after the child was wrongfully removed and "the child is now settled in its new environment[,]" Hague Convention art. 12; (2) the petitioner "was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention[,]" *id.* art. 13(a); (3) "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation[,]" *id.* art. 13(b); (4) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views[,]" *id.* art. 13; and (5) the return of the child "would not be permitted by the fundamental principles . . . relating to the protection of human rights and fundamental freedoms," *id.* art. 20.

10

*Gitter*, 396 F.3d at 134; *see also Villegas Duran*, 534 F.3d at 147 (adhering to *Gitter*'s articulation of the standard). The intent of the parties is a "question of fact" to be determined by the district court. *Gitter*, 396 F.3d at 133.

With these principles in mind, the Court considers E.D.T.'s residences in chronological order. It is clear that E.D.T.'s first habitual residence was in the United States: E.D.T. was born here in 2002 and lived here until September 2003.

Tayson argues that this was the parties' last shared intent. The Court concludes, however, that E.D.T. acquired a new habitual residence in 2003 when she moved to Ghana, a habitual residence she maintained until 2008. It is clear that Adamah's intent during that period was for E.D.T. to live with Adamah's mother. As for Tayson, he was well aware that the child would be residing in Ghana before Adamah left the United States. He assisted Adamah in putting that plan into action in the late summer of 2003. Tayson visited his daughter in Ghana in 2004, and maintained electronic contact with her afterwards; at no time during E.D.T.'s residence in Ghana did he institute any proceedings to have her returned to the United States. Tayson and Adamah saw each other in the United States in May 2004 — only one month before his visit to E.D.T. in Ghana — but Tayson did not object to E.D.T.'s living arrangements. By 2005, Tayson and Adamah's divorce was finalized, but Tayson made no claim to custody of E.D.T. It is therefore clear that the parties shared an intent for E.D.T. to reside in Ghana.

It remains to consider whether the parties shared an intent for E.D.T. to become a habitual resident of the United Kingdom, and leave behind her residency in Ghana. It is clear that, at least initially, Tayson did not consent to E.D.T.'s relocation to

London. The Court credits his testimony that he was surprised that she had moved: Adamah and Tony Tayson corroborated his account that, during his visit to London in the summer of 2008, Tayson reported to British authorities that E.D.T. had been kidnaped. There was clearly an interregnum during which the parties did not share an intent about E.D.T.'s residence. Nonetheless, the record is clear that Tayson acquiesced in E.D.T.'s residency in London and came to share Adamah's intent for her to remain there. Tayson stated his intent to return E.D.T. to London following the 2008 Christmas holiday. After retaining her in the United States, he told Adamah in a text message that it had "never" been his intention to keep her. Indeed, the record compels the conclusion that Adamah would never have put E.D.T. on the transatlantic flight but for Tayson's contemporaneous representations of his intent to return her. Only after being served with the petition and retaining counsel did Tayson conjure his alternative explanations that either Adamah had absconded with E.D.T. from the United States back in 2003, or that Adamah and Tayson had agreed that E.D.T. would acquire a new habitual residence in the United States upon arrival in late 2008. Neither explanation is supported by the record.

The parties shared an intent that E.D.T. remain a resident of the United Kingdom; her visit to the United States was always intended to be temporary. The Court does not find any unusual circumstances that should trump the shared intent of the parties. *See Gitter*, 396 F.3d at 134 ("Normally the shared intent of the parents should control"). Therefore, the Court concludes that E.D.T. was a habitual resident of the United Kingdom when Tayson wrongfully retained her.

Even if there were a conflict between the parties' intent, the record "unequivocally points to the conclusion" that E.D.T. was acclimatized to living in the United Kingdom. *See id.* (child may acquire a new habitual residence "notwithstanding any conflict with the parents' latest shared intent"). Acclimatization requires physical presence for a "sufficient amount of time[.]" *Id.* at 131. E.D.T. was living with Adamah in London; Adamah and Adamah's mother had been E.D.T.'s primary caregivers for nearly all of her life. E.D.T. was attending primary school in London; her school records reflect that she was making "fantastic progress," was "achieving above the national expectations for her age," "loved learning," and was "enthusiastic and always approache[d] new challenges with a smile." Petr's Ex. 11 at 4-5. Finally, E.D.T. was just over five years of age when she moved to London and just over six years of age when she left. This period of almost one year spent in London is a substantial amount of time for one of such tender age. *See, e.g., Falk v. Sinclair,* ___ F. Supp. 2d ___, 2010 WL 723744, at *13 (D.Me. Mar. 19, 2010) (finding acclimatization where seven-year old had spent one year in country of habitual residence; "the amount of time during which [the child] lived primarily in Germany . . . is consistent with a finding of acclimatization for a child of her age"); *In re Kim*, 404 F. Supp. 2d 495, 514-15 ("the amount of time for a four-year-old to acclimatize to a new residence is less than that for an older child"; concluding that "handful of days" failed to suffice).

\* \* \*

The parties proffered a number of collateral matters in an effort to tip the balance. Both accused each other of defrauding their respective domestic governments; Adamah accused Tayson of abusive physical and verbal acts during the marriage; Tayson

claimed that Adamah was an unfit parent. None of these accusations was proven, and the Court did not rely upon any of the evidence proffered on these collateral issues in reaching its decision. The habitual residence of the child is what controls, and that habitual residence was the United Kingdom when Tayson wrongfully retained E.D.T.

## CONCLUSION

The Court finds that the retention of E.D.T. in the United States in 2009 by Tayson was wrongful. Adamah's petition is therefore granted. The Court orders the return of E.D.T. forthwith to the United Kingdom. Within ten calendar days of the date of this order, the parties shall inform the Court of a mutually agreeable date upon which E.D.T. shall be returned. If the parties cannot agree upon a date of return, the Court shall specify one.

The Court directs the Clerk of the Court to release E.D.T.'s birth certificate to Adamah or Adamah's counsel immediately. Pending E.D.T.'s return to the United Kingdom, Tayson is ordered not to take E.D.T. outside of the tri-state area (New York, New Jersey, Connecticut) without leave of the Court. Once E.D.T. is returned to the United Kingdom, the Clerk is authorized to release Tayson's passport to Tayson.

**PETITION GRANTED.**[8]

s/Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
May 27, 2010

---

[8] Adamah also seeks an order of costs and fees: "Any court ordering the return of a child ... shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees ... and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 42 U.S.C. § 11607(b)(3). Within 10 days of E.D.T.'s return to the United Kingdom, the parties shall file a joint letter advising whether Adamah maintains her request; if so, the parties shall advise the Court of their mutually agreed-upon briefing schedule.